1  QUINN EMANUEL URQUHART & SULLIVAN, LLP

2  Charles K. Verhoeven (Bar No. 170151)
   charlesverhoeven@quinnemanuel.com
3  David Bilsker (Bar No. 152383)
   davidbilsker@quinnemanuel.com
4  Emily O'Brien (Bar No. 240072)
   emilyobrien@quinnemanuel.com
5
6
7  50 California Street, 22 Floor
   San Francisco, California  94111-4788
8  Telephone:  (415) 875-6600
   Facsimile:   (415) 875-6700

9  Attorneys for Plaintiff
   Avery Dennison Corporation
10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14  AVERY DENNISON                    CASE NO. _____
    CORPORATION,
15                                    **COMPLAINT**
              Plaintiff,
16
17       vs.
18  3M COMPANY and 3M
    INNOVATIVE PROPERTIES
19  COMPANY,

20            Defendants.

21

22        Plaintiff Avery Dennison Corporation ("Avery"), for its Complaint against

23  Defendants 3M Company ("3M Company") and 3M Innovative Properties Company

24  ("3M Properties") (collectively, "3M"), alleges as follows:

25                    **SUMMARY OF THE ACTION**

26        1.    3M has nearly a 100% share of the worldwide market for Type XI

27  retroreflective sheeting used for highway signage (hereinafter, "the Type XI Sheeting

28

                              1

Market"). This market exists because government agencies frequently specify that only Type XI sheeting can meet bid requirements.

2. 3M has at least a 70% share of the broader worldwide market for high performance retroreflective sheeting used on highway signage composed of ASTM International ("ASTM") sheeting Types VIII, IX and XI (hereinafter, "the Broad High Performance Sheeting Market"). This market exists because government agencies specify these sheeting types together as those that can meet bid requirements.

3. This action arises from various acts of monopolization, fraud, and unfair competition committed by 3M with respect to the Type XI and Broad High Performance Sheeting Markets. 3M's illegal and anticompetitive conduct centers around its manipulation of the standards setting process of ASTM, the private standards setting organization responsible for creating and maintaining standards for retroreflective sheeting, illegal contracts that lessen competition, and various anticompetitive acts, including false advertising and acts of disparagement, designed to steer customers away from Avery's high performance sheeting products and towards a new Type XI high performance retroreflective sheeting standard that 3M now claims as proprietary.

4. In or around 2004, 3M approached ASTM about adopting a new standard for high performance retroreflective sheeting – the Type XI standard. If successful at ASTM, a new market would emerge for Type XI sheeting.

5. At the same time, 3M had issued patents and was prosecuting several patent applications purportedly covering the same specification embodied in the new Type XI standard 3M had proposed to ASTM.

6. Because there is a perception in the retroreflective sheeting marketplace that higher sheeting types equate to higher quality products, 3M knew that adoption of a new Type XI standard by the ASTM would allow it to steer a majority of purchasers in the Broad High Performance Sheeting Market to the new Type XI Sheeting Market. 3M also knew that its patents would be a significant barrier to anyone wanting to offer

2

1   a Type XI product, and therefore it stood to further gain monopoly power over the
2   Broad High Performance Sheeting Market if the Type XI standard passed. In recent
3   years, 3M's course of conduct has come to be known as a "patent hold up."

4        7.      The potential harm to competition that could result from the new standard
5   3M proposed did not go unnoticed. The other ASTM members (including Avery)
6   quickly realized what 3M was attempting to do and strenuously objected. In response,
7   3M represented that it would not use its patents to block competition for products
8   meeting the Type XI standard. 3M made this representation on several occasions
9   during the course of the approval process for the new Type XI standard. In at least one
10  instance, 3M provided written notice that it had withdrawn patent claims related to the
11  ASTM Type XI standard from consideration by the Patent Office.

12       8.      Relying on 3M's representations that it would not use its patents to block
13  competition, the other ASTM members eventually dropped their negative votes and
14  agreed to adopt the new Type XI standard.

15       9.      Despite 3M's assurances, and unbeknownst to the other ASTM members,
16  3M continued to prosecute several patent applications allegedly covering the new Type
17  XI standard. 3M even revived the very claims that it had previously represented had
18  been withdrawn from the Patent Office. 3M took these actions without ever informing
19  Avery or the other ASTM members. Instead, 3M remained silent while Avery (and
20  possibly others) invested substantial resources in the research and development of its
21  own Type XI sheeting.

22       10.     3M is now doing what it told the other ASTM members it would not do –
23  using its patents to block competition in the Type XI and Broad High Performance
24  Sheeting Markets. While actively touting the Type XI standard in the marketplace, 3M
25  is simultaneously asserting its patents in an attempt to block others from offering their
26  own Type XI products. 3M is disregarding its earlier representations and attempting to
27  leverage its patents to further gain monopoly power in the Type XI and Broad High
28  Performance Sheeting Markets.

COMPLAINT

11.    In May 2010, Avery launched the OmniCube™ T-11500 product ("OmniCube™"), the only other Type XI product currently on the market.

12.    On June 25, 2010, 3M filed a complaint alleging that Avery's OmniCube™ product infringes thirteen patents owned by 3M.

13.    On July 28, 2010, 3M moved for a preliminary injunction to prevent Avery from manufacturing or selling its OmniCube™ product during the pendency of the litigation.

14.    In addition to the assertion of its patents, 3M has engaged in and continues to engage in other anticompetitive and predatory acts designed to interfere with Avery's ability to market and sell OmniCube™ and other high performance sheeting products.

15.    For example, 3M's tactics include the misrepresentation of the quality of Avery's products and improper characterization of the performance of its own Type XI sheeting product as compared to other types of sheeting.   On information and belief, 3M has also entered agreements with contractors, who are major customers of high performance sheeting, that are designed to discourage and prevent these customers of high performance sheeting products from purchasing anything other than 3M's products.

16.    As a result of its anticompetitive conduct, 3M has restrained trade and continues to restrain trade in the Type XI and Broad High Performance Sheeting Markets.   Rather than compete against Avery on the merits, 3M is using unlawful and anticompetitive practices to undermine competition.

17.    3M's actions have injured competition and caused and continue to cause damage and injury to Avery in its business and property.

## PARTIES

18.    Avery is a corporation organized and existing under the laws of the State of Delaware having a principal place of business at 150 North Orange Grove Boulevard, Pasadena, California 91103.

4

19.     Upon information and belief, 3M Company is a corporation organized and existing under the laws of the State of Delaware having a principal place of business at 3M Center, St. Paul, Minnesota 55133.

20.     Upon information and belief, 3M Properties is a wholly-owned subsidiary of 3M Company having a principal place of business at 3M Center, St. Paul, Minnesota 55133.

## JURISDICTION AND VENUE

21.     This is a civil action arising under the Sherman Act, 15 U.S.C. §§1 and 2; the Lanham Act, 15 U.S.C. §1125; the California Business and Professions Code; and common law.

22.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. §§ 1331, 1337(a), and 1367.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22.

24.     This Court has personal jurisdiction over 3M Company and 3M Properties by virtue of, *inter alia*, their transaction of business and derivation of substantial revenue from services or things used or consumed in this judicial district, their substantial and continuous contacts with this judicial district, and their purposeful availment of the rights and benefits of California law, including the offer for sale, sale and supply of high performance sheeting and Type XI sheeting in this state and judicial district.

## BACKGROUND

### Technology

25.     The retroreflective sheeting which is at the heart of this case is used in a wide variety of applications where visibility is critical, such as road signs and traffic barriers. Because it has the unique ability to redirect light back towards the originating source, retroreflective sheeting imparts a high degree of reflectivity to the underlying

COMPLAINT

1  article. It is usually manufactured with an adhesive backing that allows for easy

2  application.

3      26.    The retroreflective sheeting at issue is built around the concept of triple

4  reflectors – prism-like structures where three reflecting surfaces meet at perpendicular

5  angles, like the way walls in the corner of a room meet. As shown below, these

6  structures generally reflect light parallel to the way it enters. By contrast, a mirror

7  reflects light at an angle opposite to its entrance angle.




          Retroreflector                  Mirror

13      27.    As retroreflective sheeting gained wider use on highway applications, such

14  as road signs and barricades, ASTM became involved to adopt retroreflective sheeting

15  standards.

16      28.    ASTM is one of the largest standard setting organizations in the world. It

17  was founded in 1898 by a group of engineers and scientists working to address frequent

18  breaks in steel rails used in the emerging railroad industry. Their work led to the

19  standardization of steel rails, which ultimately resulted in higher quality rails and

20  improved safety for the public. Today, ASTM is widely recognized around the world

21  for the quality and market relevance of its technical standards.

22      29.    ASTM is made up of over 130 technical committees covering a vast array

23  of industry areas, ranging from metals to the environment. One of ASTM's technical

24  committees is the committee on "Road and Paving Materials," also referred to as "Main

25  Committee D04" ("the Main Committee"). The Main Committee is responsible for the

26  establishment and supervision of over 200 standards related to highway construction

27  and maintenance, including road signs.

30.    The Main Committee is broken up into several subcommittees, one of which is the subcommittee on "Highway Traffic Control Materials," also referred to as Subcommittee D04.38 ("the HTCM Subcommittee").

31.    The HTCM Subcommittee is divided into several smaller "task groups" focused on particular areas of highway construction.  One of these task groups is the Retroreflective Sheeting Task Group ("the Retroreflective Task Group").  As its name implies, the Retroreflective Task Group focuses on standards related to retroreflective sheeting used on road signs.

32.    One of the standards for which the HTCM Subcommittee and the Retroreflective Task Group are responsible is ASTM Specification No. D4956 ("Spec. No. D4956"), the "Standard Specification for Retroreflective Sheeting for Traffic Control."  Spec. No. D4956 covers microprismatic, retroreflective sheeting designed for use on traffic control signs, delineators, barricades, and other devices.

33.    Spec. No. D4956 has been broken down into eleven different "types" of sheeting ranging in levels of brightness at different observation and entrance angles. The levels of brightness for each type of sheeting are described in tabular format.  By way of example, the table for Type XI sheeting is reproduced below:

TABLE 10 Type XI Sheeting[A]

| Observation Angle | Entrance Angle | White | Yellow | Orange | Green | Red | Blue | Brown | Fluorescent Yellow-Green | Fluorescent Yellow | Fluorescent Orange |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.1°[B] | –4° | 830 | 620 | 290 | 83 | 125 | 37 | 25 | 660 | 500 | 250 |
| 0.1°[B] | +30° | 325 | 245 | 115 | 33 | 50 | 15 | 10 | 260 | 200 | 100 |
| 0.2° | –4° | 580 | 435 | 200 | 58 | 87 | 26 | 17 | 460 | 350 | 175 |
| 0.2° | +30° | 220 | 165 | 77 | 22 | 33 | 10 | 7.0 | 180 | 130 | 66 |
| 0.5° | –4° | 420 | 315 | 150 | 42 | 63 | 19 | 13 | 340 | 250 | 125 |
| 0.5° | +30° | 150 | 110 | 53 | 15 | 23 | 7.0 | 5.0 | 120 | 90 | 45 |
| 1.0° | –4° | 120 | 90 | 42 | 12 | 18 | 5.0 | 4.0 | 96 | 72 | 36 |
| 1.0° | +30° | 45 | 34 | 16 | 5.0 | 7.0 | 2.0 | 1.0 | 36 | 27 | 14 |

[A] Minimum Coefficient of Retroreflection $(R_A)$ cd/fc/ft$^2$(cd·lx$^{-1}$·m$^{-2}$).
[B] Values for 0.1° observation angle are supplementary requirements that shall only apply when specified by the purchaser in the contract or order.

34.    On information and belief, most federal, state, and local governments use Spec. No. D4956 in their specifications for various highway products that use retroreflective sheeting.

35.    On information and belief, there is a well-recognized perception in the marketplace that higher type numbers translate into better quality sheeting.  As a result

7

1    of this perception, those responsible for highway projects – usually federal and state

2    departments of transportation ("DOTs") – typically request, and often require, that the

3    sheeting used in their projects is the highest type cited in Spec. No. D4956.

4         36.    Today, the highest type sheeting cited by Spec. No. D4956 is Type XI.

5              **3M's Manipulation of the Standards Setting Process**

6         37.    In or around 2004, 3M embarked on a course of conduct designed to

7    manipulate the standards setting process of the ASTM, thereby creating a monopoly for

8    itself in the Type XI Sheeting Market and expanding its monopoly power in the Broad

9    High Performance Sheeting Market.

10        38.    On December 8, 2004, at an ASTM meeting in Washington, DC, 3M first

11   introduced the idea of adding a new Type XI standard to Spec. No. D4956.  At the

12   break-out meeting of the Retroreflective Task Group, 3M's representative presented

13   3M's proposal.  Because there was insufficient time for discussion, the Retroreflective

14   Task Group decided to take the issue up in subsequent conference calls.

15        39.    On February 1, 2005 and March 29, 2005, the Retroreflective Task Group

16   held the scheduled conference calls to discuss 3M's proposal.  Because ASTM rules

17   and procedure did not require formal balloting at the task group level, the members of

18   the Retroreflective Task Group decided to circulate an informal ballot on the issue of

19   whether to include a new Type XI standard in Spec. No. D4956.

20        40.    The vote on the informal ballot at the task group level resulted in 12

21   negative votes and 1 positive vote.  The only person to vote "yes" for 3M's proposal

22   was 3M's own representative.

23        41.    On June 15, 2005, the ASTM held its next meeting in Reno, Nevada.  At

24   this meeting, the Retroreflective Task Group discussed 3M's earlier proposal to add a

25   new Type XI standard to Spec. No. D4956.  In particular, the Retroreflective Task

26   Group addressed the rationale behind each negative vote on the informal ballot issued

27   at the task group level.

28

42.     The discussion at the task group level made clear that 3M's patent positions were the major cause of the negative votes. Members of the Retroreflective Task Group expressed the opinion that adoption of a new Type XI standard would create a proprietary specification that only 3M could satisfy.

43.     For example, the Ohio DOT representative explained that he voted negative because he did not want to perpetuate proprietary types in Spec. No. D4956. The Texas DOT representative likewise voted negative because he wanted a less proprietary specification.   Avery's representative voted negative because 3M was seeking patents concerning the Type XI specification, and Avery did not want to create a standard for which no other manufacturer could supply a product without subjecting itself to a patent infringement lawsuit.

44.     On October 17, 2005, despite the overwhelming majority of informal negative votes at the task group level, 3M's representative pushed forward a formal ballot to the HTCM Subcommittee members seeking to add a new Type XI standard to Spec. No. D4956.   The formal ballot at the subcommittee level drew 22 affirmative votes and only 9 negative votes.

45.     The drastically different vote obtained at the subcommittee level versus the task group level was likely a direct result of 3M's manipulation of the ASTM's membership and voting procedures.

46.     In December 2004, when 3M introduced its proposal to amend Spec. No. D4956, the HTCM Subcommittee consisted of approximately 30 members who could vote on such a proposal.   Realizing that it did not have enough support to push its proposal through the HTCM Subcommittee, 3M began recruiting new members to the HTCM Subcommittee that it knew would vote in its favor.

47.     In the months leading up to the October 17, 2005 ballot, many new members joined the HTCM Subcommittee. A significant portion of the members were from municipalities. Prior to this time, very few, if any, municipalities were members of the HTCM Subcommittee.  The fact that so many municipality members joined the

1   HTCM Subcommittee at the same time was unusual.  The new municipality members,

2   however, had two things in common.  First, they were all customers of 3M.  Second,

3   when an HTCM Subcommittee vote required actual attendance at the meetings, they

4   allowed 3M to hold their proxies.

5        48.    On December 7, 2005, the HTCM Subcommittee held its next meeting in

6   Dallas, Texas.   At that meeting, 3M requested that the HTCM Subcommittee go

7   forward with a vote to overcome the 9 negative votes cast on the formal ballot measure

8   for Type XI in October 2005.  Such a vote required a two-thirds majority.  At least six

9   of the new municipality members of the HTCM Subcommittee were not present at the

10  Dallas meeting and were going to cast their votes by proxy.  On information and belief,

11  in all six cases, the persons holding the proxy for the absentee municipality member

12  were either current or retired employees of 3M.   The other HTCM Subcommittee

13  members, realizing that the onslaught of new members and the use of proxy votes could

14  produce a skewed result, were able to create a written procedure to deal with the

15  negative votes over the next few months.

16       49.    The procedure the HTCM Subcommittee adopted required each negative

17  vote to be accompanied by a formal written statement called a "Negative."  3M was

18  then allowed to formally address each Negative in a written response and each person

19  who submitted a Negative was allowed the opportunity to rebut 3M's response in

20  writing.  The entire package of Negatives, 3M's responses, and negative vote rebuttals

21  would then be circulated to the full HTCM Subcommittee and discussed via conference

22  calls in March 2006.

23       50.    Following the December 7, 2005 meeting in Dallas, Avery contacted four

24  of the new municipality members to confirm its suspicion that the new HTCM

25  Subcommittee members were not acting on their own initiative but were being directed

26  by 3M.  Avery learned that none of these four members had any idea of the substance

27  of prior ballots on which they had cast votes by proxy regarding the Type XI standard.

28  Nor were any of these members aware of any of the deliberations regarding 3M's

1   proposal to add a new Type XI standard to Spec. No. D4956.  In fact, none of those

2   contacted had ever even heard of Spec. No. D4956.

3         51.     Like the Negatives at the Retroreflective Task Group, the Negatives

4   resulting from the HTCM Subcommittee vote on October 17, 2005 once again made

5   clear that many HTCM Subcommittee members objected to 3M's attempt to create a

6   proprietary specification.

7         52.     For example, the Negative of the Ohio DOT representative explained that

8   he was objecting because 3M was attempting to "create the illusion of a competitive

9   environment to the casual user of the specification, when in reality, a proprietary

10   condition exists."

11         53.     Likewise, the Negative of an Avery representative specifically explained

12   the danger of adopting a new standard potentially covered by 3M's patents:

13              Many members on this Sub-Committee may not realize it,
but the product (DG3) outlined by the current ASTM ballot
14              is a heavily patented and proprietary product.  3M Company
has filed and received many patents on this product.  As
15              such, <u>adopting the current Type 11 proposal will result in a
proprietary and monopolistic position for 3M.</u>

16

17         54.     Further, the Negative of another Avery representative explained:

18              If we add a Type XI we create the illusion that the purchaser
is specifying a level of performance available from a group
19              of products.  But we know they are in fact creating a sole-
source specification.  If a purchaser desires DG3, they should
20              call it out by name, and justify their wish to specify a sole-
source product and not hide behind an ASTM curtain.  Type
21              XI performance may be patent protected.  Adding a Type XI
is also problematic in that several of the performance
22              requirements in the proposal may be protected by intellectual
property.  Not only are specific designs claimed, certain SIA
23              ranges (when measured with cited ASTM procedure) have
been claimed.

24         55.     3M's written responses to the 9 pending Negatives specifically addressed

25   the concerns of the HTCM Subcommittee members related to 3M's patents.  In its

26   responses, 3M indicated that it would not use its patents to block others from offering a

27   product meeting the Type XI standard.

28

56.     For example, in its written response to one of Avery's Negatives, 3M responded that "[t]he intellectual property claims at issue (those that relate to the ASTM performance standards) have been withdrawn from consideration before the U.S. Patent and Trademark Office."

57.     On March 25, 2006, in anticipation of the conference calls to discuss the Negatives, 3M's responses to the Negatives and any rebuttals, Avery circulated a PowerPoint presentation to some of the other members of the HTCM Subcommittee warning of the dangers of adopting a new standard that was potentially covered by 3M's pending patent applications.  In that presentation, Avery explained:

> Any material that can meet the proposed Type XI will likely violate a 3M patent through:  retroreflective performance, design, manufacturing process.

> *        *        *

> In [the '983 application], 3M has gone beyond patenting the design or manufacturing, they have patented standardized testing performance!

> *        *        *

> Notice, that in order to meet their proposed [Type XI] specification – you MUST violate this patent.  Granting the specification allows ONLY their product – any other products would be in violation and thrown into court!

> *        *        *

> Again – this kind of patent turns the specification into a lawsuit trap!

58.     In addition, Avery also included a list of several issued patents and pending applications that it believed could be used by 3M to hamper others from offering a Type XI product.   Those patents and pending applications included:

> U.S. Patent No. 5,981,032
> U.S. Patent No. 6,114,009
> U.S. Patent No. 6,447,878
> U.S. Patent No. 6,120,881
> U.S. Patent No. 6,257,860
> U.S. Patent No. 6,318,987
> U.S. Publication No. 2004/0212887
> U.S. Patent No. 6,386,855
> U.S. Patent No. 5,898,523

U.S. Patent No. 7,152,983
(identified by its Publication No. 2004/0174601)
U.S. Patent No. 7,156,527
(identified by its Publication No. 2004/0174603)
U.S. Patent No. 6,253,442
U.S. Patent No. 6,884,371
U.S. Patent No. 7,309,135
(identified by its Publication No. 2005/0180012)

59.   On March 27, 2006, the HTCM Subcommittee held the first conference call to discuss the pending Negatives. After the call, 3M's representative circulated an email confirming that the claims covering ASTM performance standards had been withdrawn. Further, he even included the Notice of Withdrawal issued by the Patent Office for some of those claims:

60.   In his March 27, 2006 email, 3M's representative also stated that "[n]o other claims contained in the application have been granted to date."

61.   On March 28, 2006, the HTCM Subcommittee held the second conference call to discuss the pending Negatives. According to the meeting minutes from that teleconference, a representative from Reflexite Corporation ("Reflexite") specifically asked for "an interpretation of the current patent continuation claim as of January 12, 2006" and whether it "affect[ed] the previous claim withdrawal?"

62.   According to the March 28, 2006 meeting minutes, 3M's representative responded to the inquiry from Reflexite by stating that he had spoken with 3M's patent attorney and that "[t]he claims regarding the retroreflectivity at ASTM specific geometries have been withdrawn . . . ."

13

63.     On May 30, 2006, the HTCM Subcommittee issued another formal ballot to allow the HTCM Subcommittee members to vote on each Negative individually. Pursuant to ASTM voting procedures, each Negative had to be defeated by a two-thirds majority at the HTCM Subcommittee level before the ballot could proceed to the Main Committee.

64.     As a result of the May 30, 2006 formal ballot, each Negative was defeated by the required two-thirds majority at the HTCM Subcommittee level. The outcome of the vote, and thus the fate of the 9 pending Negatives, was a direct result of 3M's manipulation of the ASTM membership process.

65.     By the time the new ballot issued on May 30, 2006, the HTCM Subcommittee had swelled to approximately 88 voting members. The vote on the new ballot resulted in 71 members either abstaining or voting against all 9 of the pending Negatives. Of those 71 members, 57 had been members of the HTCM Subcommittee for less than one year. On information and belief, a significant number of the new members were 3M recruits.

66.     On October 4, 2006, after 3M had successfully defeated the Negatives at the HTCM Subcommittee by representing that it had withdrawn patent claims related to the Type XI standard, the Main Committee issued its own formal ballot on 3M's proposal to add a new Type XI standard to Spec. No. D4956. The formal ballot at the Main Committee drew 119 affirmative votes and 11 negative votes.

67.     As with the vote at the HTCM Subcommittee, ASTM voting procedures required each Negative vote at the Main Committee level to be accompanied by a written explanation. Further, before ASTM could officially adopt the ballot measure, each of the 11 pending Negatives had to be voted down by a two-thirds majority vote at both the HTCM Subcommittee and Main Committee levels.

68.     The next ASTM meeting was scheduled for December 6-7, 2006 in Atlanta, Georgia. Upon information and belief, 3M took measures to ensure that each

1   of the 11 pending Negatives would be defeated by the required two-thirds majority vote

2   by the HTCM Subcommittee during this meeting.

3       69.    On December 6, 2006, the HTCM Subcommittee met to vote on the 11

4   pending Negatives.  Upon information and belief, prior to the HTCM Subcommittee

5   vote, 3M contacted several of its customers attending a 3M customer seminar in Atlanta

6   who also happened to be voting members of the HTCM Subcommittee.    On

7   information and belief, some of these customers were the same members whom 3M had

8   previously recruited to join the HTCM Subcommittee  to gain support for its Type XI

9   proposal and who had granted 3M their proxies on earlier votes.  Upon information and

10  belief, 3M arranged for the transportation of these customers from the 3M customer

11  seminar to the HTCM Subcommittee meeting to cast their votes.

12      70.    On December 6, 2006, the HTCM Subcommittee voted down each of the

13  11 pending Negatives by the required two-thirds majority of the voting members

14  present at the HTCM Subcommittee, which included the members that 3M had

15  transported to the HTCM Subcommittee meeting.

16      71.    On December 7, 2006, the Main Committee upheld one of the 11 pending

17  Negatives dealing with daytime luminescence values.  Due to this Negative, the ballot

18  measure was temporarily defeated.

19      72.    Over the next several meetings, the HTCM Subcommittee addressed the

20  issue concerning daytime luminescence.   It also worked on consolidating and

21  eliminating the specifications for Types VII and X retroreflective sheeting in Spec. No.

22  D4956.

23      73.    In September 2008, 3M reintroduced its proposal to the HTCM

24  Subcommittee to revise Spec. No. D4956 to include a new Type XI sheeting.  By that

25  time, the issues regarding daytime luminescence had been worked out and acceptable

26  proposals had been generated for eliminating Types VII and X retroreflective sheeting

27  in Spec. No. D4946.

28

COMPLAINT

74.     In June 2009, the ASTM formally adopted 3M's proposal for the addition of a new Type XI standard to Spec. No. D4956.  In August 2009, the revised Spec. No. D4956 published with the new Type XI standard.

75.     At no time prior to adoption of the new Type XI standard did 3M ever inform Avery or the other HTCM Subcommittee members that 3M had (1) continued to prosecute patent applications purporting to cover the Type XI standard, (2) that on August 2, 2007 it revived in a divisional patent application the very claims relating to the new Type XI standard that it had represented on three previous occasions had been withdrawn from the Patent Office, or (3) received several issued patents purporting to cover the new Type XI standard.  Instead, 3M remained silent while Avery and others voted on the Type XI standard thinking the patent issues had been resolved.  Avery and, on information and belief, other HTCM Subcommittee members were unaware of these facts when the ASTM adopted the new Type XI standard, and could not reasonably have discovered these facts in light of 3M's misleading conduct.  Avery moved forward with the research and development of its OmniCube™ product.

### 3M's Campaign to Shift Consumers to Type XI Sheeting

76.     3M markets and sells a Type XI retroreflective sheeting product known as Diamond Grade™ DG$^3$ ("DG3").  3M states that it began selling its DG3 product in 2005.

77.     Until Avery introduced its OmniCube™ product earlier this year, 3M's DG3 product was the only product on the market meeting the Type XI standard adopted in August 2009.

78.     Upon information and belief, 3M's advertising campaign and related marketing activities with respect to its DG3 product are directed in large part toward persuading end-users to switch from other types of retroreflective sheeting to Type XI. 3M is attempting to shift consumers in the Broad High Performance Sheeting Market to purchase Type XI sheeting.  In so doing, 3M intends to expand its monopoly in the Broad High Performance Sheeting Market and the Type XI Sheeting Market.

79.     On information and belief, to facilitate this shift, 3M launched a marketing campaign falsely representing that Type XI sheeting is significantly brighter than other types of retroreflective sheeting.   As part of this campaign, 3M uses deceptive advertisements in the form of a video challenge on its website allegedly depicting the brightness of its DG3 sheeting versus other types of sheeting.   On information and belief, the intent of these advertisements is to persuade end-users to switch from other types of retroreflective sheeting to DG3.

80.     On information and belief, 3M also offers a grant program to encourage state agencies to replace their current road signs with signs made from Type XI sheeting.   On information and belief, 3M intends this grant program to persuade end-users to switch from other types of retroreflective sheeting to Type XI.

**3M's Efforts to Block Avery from Participating in the Broad High Performance Sheeting and Type XI Sheeting Markets**

81.     Simultaneous with its efforts to shift the Broad High Performance Sheeting Market to the Type XI Sheeting Market, 3M has taken actions and continues to take actions to prevent Avery from competing in the Type XI Sheeting Market. 3M has also engaged in and continues to engage in a course of conduct designed to restrain competition by preventing Avery from competing in the Broad High Performance Sheeting Market generally, thereby strengthening its own monopoly position in both markets.

82.     For example, despite its earlier representations to the HTCM Subcommittee, 3M is currently asserting numerous patents against Avery in an attempt to enjoin the sale of OmniCube™, Avery's Type XI product.   On June 25, 2010, 3M filed a complaint in the United States District Court for the District of Minnesota ("the Minnesota action") alleging that the OmniCube™ product infringes thirteen patents owned by 3M.   On July 28, 2010, 3M moved for a preliminary injunction in the Minnesota action seeking to preclude Avery from manufacturing or selling its OmniCube™ product.

83.    In addition to the assertion of its patents, 3M has taken several steps to prevent others from purchasing Avery's high performance sheeting products.

84.    For example, on information and belief, 3M sent the following picture to a potential Avery customer in the Broad High Performance Sheeting Market:



85.    On information and belief, 3M represented to the customer that the sign on the left of the image that is peeling and deteriorating was made using Avery's retroreflective sheeting.  On information and belief, 3M made these representations with the intention of persuading the customer to use 3M's high performance retroreflective sheeting in place of Avery's product.

86.    3M's representations to the potential Avery customer concerning the signs depicted in ¶84 were false.  The sheeting in the picture on the left is not an Avery product.

87.    On information and belief, 3M has also entered into agreements with key contractors who are responsible for the majority of private party purchases and installations of retroreflective sheeting in the Broad High Performance Sheeting and the Type XI Sheeting Markets.  On information and belief, these agreements contain provisions that 3M interprets as requiring the contractors to promote and purchase 3M products whenever a 3M product is identified by name in a bid specification, even when the bid also states that other products can also meet the specification.

COMPLAINT

## COUNT 1
## SHERMAN ACT §2:
## MONOPOLIZATION

88.   Avery incorporates by reference the averments of Paragraphs 1-87 as if fully set forth herein.

89.   3M's conduct described above constitutes monopolization and/or maintenance of monopoly power in the Broad High Performance Sheeting and the Type XI Sheeting Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

90.   Through the acts described above, 3M successfully persuaded ASTM to include a new Type XI standard in Spec. No. D4956.

91.   Through the acts described above, 3M undertook a deceptive advertising and product disparagement campaign designed to steer customers away from other high performance sheeting and to its Type XI product.

92.   On information and belief, as a result of 3M's efforts, the Broad High Performance Sheeting Market has shifted and continues to shift to the new Type XI sheeting.

93.   On information and belief, 3M knew that the market for high performance retroreflective sheeting would shift to Type XI sheeting if ASTM adopted a new Type XI standard.

94.   On information and belief, 3M's conduct in asserting patents allegedly covering the Type XI standard as well as its advertising, product disparagement campaign, and agreements with prime contractors has given it monopoly power in the Broad High Performance Sheeting Market and the Type XI Sheeting Market.

95.   On information and belief, 3M currently has a nearly 100% share of the Type XI Sheeting Market.

96.   On information and belief, 3M currently has at least a 70% share of the Broad High Performance Sheeting Market.  On information and belief, 3M's share of the Broad High Performance Sheeting Market is increasing as more and more customers shift from sheeting Types VIII and IX to Type XI.

19

97.     The anticompetitive effects of 3M's conduct outweigh any purported pro-competitive justifications.  Any purported business justifications are mere pretexts and could have been achieved in a less restrictive manner.

98.     By reason of 3M's actions, which violate Section 2 of the Sherman Act, competition in the Broad High Performance Sheeting and Type XI Sheeting Markets has declined and Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm to its high performance and Type XI sheeting businesses.

99.     Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M alleged above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

## COUNT 2
## SHERMAN ACT §2:
## ATTEMPTED MONOPOLIZATION

100.     Avery incorporates by reference the averments of Paragraphs 1-99 as if fully set forth herein.

101.     3M's conduct described above constitutes attempted monopolization of the Broad High Performance Sheeting Market and the Type XI Sheeting Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102.     Upon information and belief, 3M engaged in the conduct described above with the specific intent of monopolizing the Broad High Performance and Type XI Sheeting Markets.  There is a dangerous probability that, unless enjoined, 3M's course of conduct in falsely advertising its products, improperly characterizing the quality of competitors' products, and asserting its patents against those who attempt to offer a Type XI sheeting product, will, if it has not already done so, succeed in establishing a monopoly position in the Broad High Performance and Type XI Sheeting Markets in violation of Section 2 of the Sherman Act.

103.   By reason of 3M's actions, which violate Section 2 of the Sherman Act, competition in general has been harmed and Avery in particular has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm to its high performance and Type XI sheeting businesses.

104.   Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M alleged above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

**COUNT 3**
**SHERMAN ACT §1:**
**CONCERTED ACTION IN RESTRAINT OF TRADE**

105.   Avery incorporates by reference the averments of Paragraphs 1-104 as if fully set forth herein.

106.   3M's agreements with other ASTM members who committed to vote for 3M's proposed new Type XI standard – such as those 3M convinced to join the HTCM Subcommittee, those for whom 3M held a proxy, and those 3M customers attending 3M seminars that 3M transported to HTCM Subcommittee votes – unreasonably restrained trade and foreclosed a substantial share of the Broad High Performance Sheeting Market and the Type XI Sheeting Market in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

107.   3M's agreements with other ASTM members unreasonably restrained trade and restricted the access of 3M's competitors to significant channels of distribution, thereby restraining competition in the Broad High Performance Sheeting Market and the Type XI Sheeting Market while also foreclosing substantial interstate and foreign commerce.

108.   The purpose and effect of 3M's agreements with other ASTM members was to obtain passage of a new standard that 3M could use in combination with its patents to restrain trade and foreclose competition in the Broad High Performance Sheeting Market and the Type XI Sheeting Market.

21

109.  3M 's agreements with key contractors who are customers in the Broad High Performance Sheeting Market unreasonably restrained trade and foreclosed a substantial share of the Broad High Performance Sheeting  Market and the Type XI Sheeting Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

110.  3M's agreements with the key contractors unreasonably restrained trade and restricted the access of 3M's competitors to significant channels of distribution, thereby restraining competition in the Broad High Performance Sheeting Market and Type XI Sheeting Market while also foreclosing substantial interstate and foreign commerce.

111.  The purpose and effect of 3M's agreements with key contractors is to dissuade customers in the Broad High Performance Sheeting Market and the Type XI Sheeting Market from purchasing products other than 3M's when a 3M product name is identified in a specification even though the specification also states that other companies' products can also satisfy the specification.  Through these agreements 3M restrains trade and forecloses competition in the Broad High Performance Sheeting Market and the Type XI Sheeting Market.

112.  By reason of 3M's violation of Section 1 of the Sherman Act, Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm of its high performance retroreflective sheeting business.

113.  Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

## COUNT 4
## CAL. BUS. & PROF. CODE SECTION 16720:
## THE CARTWRIGHT ACT

114. Avery incorporates by reference the averments of Paragraphs 1-113 as if fully set forth herein.

115. 3M's agreements with other ASTM members who committed to vote for 3M's proposed new Type XI standard – such as those 3M convinced to join the HTCM Subcommittee, those for whom 3M held a proxy, and those 3M customers attending 3M seminars that 3M transported to HTCM Subcommittee votes – unreasonably restrained trade and foreclosed a substantial share of the Broad High Performance Sheeting Market and the Type XI Sheeting Market in violation of Section 16720 of the California Business and Professions Code ("the Cartwright Act").

116. 3M's agreements with other ASTM members unreasonably restrained trade and restricted the access of 3M's competitors to significant channels of distribution, thereby restraining competition in the Broad High Performance Sheeting Market and Type XI Sheeting Market while also foreclosing substantial trade within this state.

117. The purpose and effect of 3M's agreements with other ASTM members was to obtain passage of a new standard that 3M could use in combination with its patents to restrain trade and foreclose competition in the Broad High Performance Sheeting Market and Type XI Sheeting Market.

118. 3M's agreements with key contractors who are customers in the Broad High Performance Sheeting Market unreasonably restrained trade and foreclosed a substantial share of the Broad High Performance Sheeting Market and the Type XI Sheeting Market in violation of Section 16720 of the California Business and Professions Code ("the Cartwright Act").

119. 3M's agreements with the key contractors unreasonably restrained trade and restricted the access of 3M's competitors to significant channels of distribution,

1   thereby restraining competition in the Broad High Performance Sheeting Market and

2   the Type XI Sheeting Market while also foreclosing substantial trade within this state.

3       120.   The purpose and effect of 3M's agreements with key contractors is to

4   dissuade customers in the Broad High Performance Market from purchasing products

5   other than 3M's when a 3M product name is identified in a specification even though

6   the specification also states that other companies' products can also satisfy the

7   specification.   Through these agreements 3M restrains trade and forecloses competition

8   in the Broad High Performance Sheeting Market and Type XI Sheeting Market.

9       121.   By reason of 3M's violation of Section 16720 of the California Business

10  and Professions Code,  Avery has been injured in its business or property, including the

11  loss of past, present, and future profits, the loss of customers and potential customers,

12  the loss of goodwill and product image, and the prospective harm of its high

13  performance retroreflective sheeting business.

14      122.   Avery has suffered irreparable injury by reason of the acts, practices, and

15  conduct of 3M described above and will continue to suffer such injury unless and until

16  the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at

17  law.

18                      **COUNT 5**
                    **LANHAM ACT §43(a):**
19                   **FALSE ADVERTISING**

20      123.   Avery incorporates by reference the averments of Paragraphs 1-122 as if

21  fully set forth herein.

22      124.   By reason of the conduct described above regarding 3M's depiction of the

23  brightness of its DG3 product in the video challenge advertisement on its website, 3M

24  has, in connection with goods or services, used a false or misleading description of fact,

25  or a false or misleading representation of fact, that in commercial advertising or

26  promotion, misrepresents the nature, characteristics, or qualities of 3M's goods or

27  services in violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

28

COMPLAINT

125.  3M's statements and representations have actually deceived or have the tendency to deceive a substantial segment of its audience.

126.  3M's deception is material and is likely to influence the purchasing decisions of customers in the Broad High Performance and Type XI Sheeting Markets.

127.  3M's false and misleading statements and representations were and are made in interstate commerce.

128.  3M's improper conduct described above has been willful and deliberate, thereby making this an exceptional case under the Lanham Act.

129.  By reason of 3M's violations of section 43(a) of the Lanham Act, Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm of its high performance and Type XI sheeting businesses.

130.  Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M alleged above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

## COUNT 6
## CAL. BUS. & PROF. CODE §17500:
## FALSE ADVERTISING

131.  Avery incorporates by reference the averments of Paragraphs 1-130 as if fully set forth herein.

132.  By reason of the conduct described above regarding 3M's depiction of the brightness of its DG3 product in the video challenge advertisement on its website, 3M has engaged in false advertising in violation of Section 17500 of the California Business and Professions Code.

133.  By reason of the conduct described above, 3M has made statements in connection with the sale or disposition of goods or services that are untrue or misleading.

134.   Upon information and belief, 3M knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading.

135.   By reason of 3M's violations of Section 17500 of the California Business and Professions Code, Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm of its high performance and Type XI sheeting businesses.

136.   Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M alleged above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

**COUNT 7**
**CAL. BUS. & PROF. CODE §17200:**
**UNFAIR COMPETITION**

137.   Avery incorporates by reference the averments of Paragraphs 1-136 as if fully set forth herein.

138.   3M's conduct described above constitutes unlawful, unfair, or fraudulent business acts or practices in violation of Section 17200 of the California Business and Professions Code.

139.   3M's business acts or practices violate at least Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2; Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); the Cartwright Act, California Business and Professions Code §16720; and Section 17500 of the California Business and Professions Code.  3M's business acts or practices also constitute common law unfair competition, fraud, and deceit.

140.   3M's business acts or practices are immoral, unethical, oppressive, or unscrupulous and cause injury to consumers that outweighs any benefits.

141.   3M's business acts or practices are unfair and fraudulent based on, *inter alia*, its inducement of the ASTM to include a new Type XI standard; manipulation of the ASTM voting procedures to insure passage of the new Type XI standard; representation that patent claims concerning the ASTM performance standards had

26

1    been withdrawn; revival of the patent claims allegedly covering the ASTM
2    performance standards; failure to disclose that it had revived the patent claims
3    allegedly covering ASTM performance standards; failure to disclose that patents had
4    issued allegedly covering the ASTM performance standards; breach of its duties to
5    ASTM and ASTM members (including Avery) by misappropriating ASTM standards
6    and goodwill; and impediment of those selling products in compliance with Spec. No.
7    D4956 (including Avery) by asserting baseless patent infringement claims.

8         142.  3M's business acts or practices are also unfair and fraudulent based on,
9    *inter alia*, 3M's use of a false or misleading description of fact to portray its own Type
10   XI product in relation to those of its competitors; false or misleading representations of
11   fact in portraying the quality of its competitors' products, including Avery's products;
12   and agreements with key contractors, who are major customers of high performance
13   sheeting, that are designed to discourage and prevent these customers of high
14   performance sheeting products from purchasing anything other than 3M's products.

15        143.  3M's statements and representations are such that a significant portion of
16   the general consuming public or targeted consumers, acting reasonably under the
17   circumstances, will be misled.

18        144.  3M's business acts or practices were and are intended to restrain trade in
19   California by preventing its competitors from marketing and selling high performance
20   retroreflective sheeting products in this state.

21        145.  By reason of the conduct described above, regarding 3M's depiction of the
22   brightness of its DG3 product in the video challenge advertisement on its website, 3M
23   has engaged in false advertising in violation of Section 17200 of the California
24   Business and Professions Code.

25        146.  By reason of the conduct described above, 3M has made statements in
26   connection with the sale or disposition of goods or services that are untrue or
27   misleading.

28

COMPLAINT

147.   Upon information and belief, 3M knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading.

148.   Avery asserts this claim for unfair competition in its own name only and does not act for the interest of any other person or entity or for the general public.

149.   By reason of 3M's unfair competition, Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm of its high performance and Type XI sheeting businesses.

150.   Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

### COUNT 8
### COMMON LAW UNFAIR COMPETITION

151.   Avery incorporates by reference the averments of Paragraphs 1-150 as if fully set forth herein.

152.   3M's conduct described above constitutes common law unfair competition.

153.   3M's conduct constitutes unfair competition based on, *inter alia*, its inducement of the ASTM to include a new Type XI standard; manipulation of the ASTM voting procedures to insure passage of the new Type XI standard; representation that its patent claims concerning the ASTM performance standards had been withdrawn; revival of the patent claims allegedly covering the ASTM performance standards; failure to disclose that it had revived the patent claims allegedly covering ASTM performance standards; failure to disclose that patent claims had issued allegedly covering the ASTM performance standards; breach of its duties to ASTM and ASTM members (including Avery) by misappropriating ASTM standards and

COMPLAINT

1   goodwill; and impediment of those selling products in compliance with Spec. No.

2   D4956 (including Avery) by asserting baseless patent infringement claims.

3       154.   3M's business acts or practices are also unfair and fraudulent based on,

4   *inter alia*, 3M's use of a false or misleading description of fact to portray its own Type

5   XI product in relation to those of its competitors; false or misleading representations of

6   fact in portraying the quality of its competitors' products, including Avery's products;

7   and agreements with key contractors, who are major customers of high performance

8   sheeting, that are designed to discourage and prevent these customers of high

9   performance sheeting products from purchasing anything other than 3M's products.

10       155.   3M's statements and representations are such that a significant portion of

11   the general consuming public or targeted consumers, acting reasonably under the

12   circumstances, will be misled.

13       156.   3M's business acts or practices were and are intended to restrain trade in

14   California by preventing its competitors from marketing and selling high performance

15   retroreflective sheeting products in this state.

16       157.   3M's conduct also constitutes unfair competition based on its intentional

17   interference with the business relationships between Avery and its customers.

18       158.   As described above, an economic relationship existed between Avery and

19   prospective customers, seeking bids for projects requiring the use of retroreflective

20   sheeting products.

21       159.   With respect to those bids, a probability of economic benefit to Avery

22   existed based on the relationships between Avery and its customers.

23       160.   3M knew of the relationships between Avery and its customers.

24       161.   By reason of the conduct described above, 3M intended to disrupt the

25   relationships between Avery and its customers.

26       162.   By reason of the conduct described above, 3M actually disrupted the

27   relationships between Avery and its customers.

28

163.   By reason of 3M's unfair competition, Avery has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm of its high performance and Type XI sheeting businesses.

164.   Avery has suffered irreparable injury by reason of the acts, practices, and conduct of 3M described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at law.

**COUNT 9**
**FRAUD AND DECEIT**

165.   Avery incorporates by reference the averments of Paragraphs 1-164 as if fully set forth herein.

166.   By reason of the conduct described above, 3M has engaged in fraud and deceit under the common law, codified in California at Sections 1709 and 1710 of the Cal. Civil Code.

167.   3M represented to Avery and other ASTM members that if ASTM adopted a new Type XI standard, it would withdraw patent claims concerning the ASTM standard and not use its patents to block the introduction of other companies' products meeting the Type XI standard.

168.   3M made the foregoing representations knowing them to be false and with the intent of inducing reliance on its representations.  3M did not disclose to Avery or other ASTM members that it had no intention of following through on its representations.

169.   After representing to the ASTM members that it was withdrawing patent claims related to the Type XI standard, 3M had a duty to inform the ASTM members that it intended to and did revive those claims.

170.   3M failed to make such disclosures and engaged in affirmative misrepresentations despite knowing that it was required to disclose such information

30

1  after informing the other ASTM members that it was withdrawing patent claims

2  allegedly covering the Type XI standard.  In light of its prior representations, 3M's

3  silence was material.

4      171.  On numerous occasions, while 3M representatives served on the

5  Retroreflective Task Group and HTCM Subcommittee, attended ASTM meetings,

6  worked on the proposal to add a new Type XI standard to Spec. No. D4956, and met

7  individually with the other ASTM members, 3M failed to disclose material information

8  regarding its patents and pending applications.

9      172.  3M intended to induce the other members of the ASTM to adopt the new

10  Type XI standard allegedly covered by its patents.  3M knew that the other ASTM

11  members would reasonably rely on its failure to disclose its patents and pending

12  applications in adopting the new Type XI standard in light of 3M's prior

13  representations that it was withdrawing patent claims concerning the Type XI standard.

14  3M further knew that the other ASTM members would consider 3M's failure to

15  disclose its patents and pending applications as a representation that 3M had no such

16  patents or pending applications for which disclosure was required.  3M also knew that

17  the other ASTM members would consider 3M's failure to disclose its patents and

18  pending applications as a representation that 3M would not assert any patents allegedly

19  covering the new Type XI standard against the other ASTM members in the future.

20      173.  The ASTM adopted the new Type XI standard in justifiable reliance on

21  3M's silence, misleading conduct, and affirmative misrepresentations that 3M was

22  withdrawing patent claims related to the Type XI standard.

23      174.  Avery reasonably relied on 3M's representations that it would withdraw its

24  patent claims related to the ASTM Type XI performance standard and not use its

25  patents to prevent the introduction of a product complying with the Type XI

26  performance standard.  In reliance thereon, Avery invested substantial resources in the

27  research and development of its OmniCube™ product.

28

31

1    175.   By reason of 3M's fraud and deceit, Avery has been injured in its business

2    or property, including the loss of past, present, and future profits, the loss of customers

3    and potential customers, the loss of goodwill and product image, and the prospective

4    harm of its high performance and Type XI sheeting businesses.

5    176.   Avery has suffered irreparable injury by reason of the acts, practices, and

6    conduct of 3M described above and will continue to suffer such injury unless and until

7    the Court enjoins such acts, practices, and conduct.  Avery has no adequate remedy at

8    law.

### PRAYER FOR RELIEF

10    WHEREFORE, Avery seeks the following relief:

11    (A)    A judgment that 3M has violated Sections 1 and 2 of the Sherman Act, 15

12    U.S.C. §§1 and 2; Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); Sections

13    16720, 17200, and 17500 of the California Business and Professions Code; and that

14    3M's conduct constitutes unfair competition, fraud, and deceit;

15    (B)    Pursuant to at least 15 U.S.C. §§15(a) and 1117, trebled damages resulting

16    from 3M's violations of the Sherman Act and the Lanham Act;

17    (C)    Pursuant to at least 15 U.S.C. §§26 and 1116 and California Business and

18    Professions Code §17203, an injunction to prevent 3M's continued violations of the

19    Sherman Act, the Lanham Act, and the California Business and Professions Code;

20    (D)    Pre-judgment and post-judgment interest at the maximum legal rate;

21    (E)    Avery's costs, expenses, and reasonable attorneys' fees in bringing this

22    action; and

23    (F)    Such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

25    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Avery demands a

26    trial by jury on all issues so triable.

27

28

COMPLAINT

1    DATED: October 21, 2010          QUINN EMANUEL URQUHART &
2                                     SULLIVAN, LLP
3                                     By _____
4                                        David Bilsker
5                                     *Attorneys for Avery Dennison Corporation*
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                                                    COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge A. Howard Matz and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV10- 7931 AHM (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS**   (Check box if you are representing yourself ☐ )

AVERY DENNISON CORPORATION

**DEFENDANTS**

3M COMPANY and 3M INNOVATIVE PROPERTIES COMPANY

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
David Blisker (Bar No. Bar No. 152383)
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: 415/875-6600

Attorneys (If Known)

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No    **MONEY DEMANDED IN COMPLAINT: $** _____

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 U.S.C. §§ 1, 2, 1125 (a)Plaintiff alleges the defendants violated Sections 1 and 2 of the Sherman Act, Section 43(a) of the Lanham Act, the Cartwright Act, and various state codes and common law.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL INJURY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: _____

CV10 7931

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).** **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b).** **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Minnesota |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
       Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | Various Other Counties and States |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date 10/21/10

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

AVERY DENNISON CORPORATION,

PLAINTIFF(S)

v.

3M COMPANY and 3M INNOVATIVE PROPERTIES
COMANY,

DEFENDANT(S).

CASE NUMBER

**CV10 7931 AHM (RZx)**

**SUMMONS**

TO:   DEFENDANT(S): 3M COMPANY; 3M INNOVATIVE PROPERTIES COMPANY

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [X] complaint [ ] _____ amended complaint [ ] counterclaim [ ] cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, ___David Blisker___ , whose address is ___50 California Street, 22nd Floor, San Francisco, CA  94111___ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


Clerk, U.S. District Court


Dated: ___October 21, 2010___

By: _____

**CHRISTOPHER POWERS**

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    **SUMMONS**                                    CCD-1A